**This order is SIGNED.**

**Dated: August 24, 2015**

*/s/ J T Marker*

**JOEL T. MARKER**
**U.S. Bankruptcy Judge**



IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| In re: | Bankruptcy Case No. 10-23318 |
|---|---|
| DONALD BIORGE and MONICA BIORGE, | Chapter 7 |
| Debtors. | |
| STEPHEN W. RUPP, as Chapter 7 Trustee, | |
| Plaintiff, | |
| v. | Adversary Proceeding No. 13-2430 |
| DONALD BIORGE and MONICA BIORGE, | Judge Joel T. Marker |
| Defendants. | |

**MEMORANDUM DECISION**

There is much that is undisputed in this denial of discharge proceeding brought by the Chapter 7 Trustee against Donald and Monica Biorge. On the eve of bankruptcy, Donald transferred two parcels of valuable real property to a limited liability company owned by the Biorges, and the Biorges failed to disclose the transfer, the existence of the property, and the company to which the property was transferred. In response to the Trustee's claims under § 727(a)(2)(A) and (a)(4) of the Bankruptcy Code, the Biorges maintain that they lacked the requisite intent to hinder, delay, or defraud creditors or the Trustee and that they did not

1

knowingly and fraudulently make a false oath, primarily based upon an advice of counsel defense.[1]

The Court conducted a trial on July 30, 2015 and took the matter under advisement. After considering the evidence properly before the Court, assessing the credibility of the three witnesses, considering the arguments of counsel, and conducting an independent review of applicable law, the Court issues the following Memorandum Decision to explain why the Biorges' discharge will be denied.[2]

## I. FACTUAL BACKGROUND

The parties' Pretrial Order sets forth a number of undisputed facts which were received into evidence at trial, including the following:

- On March 9, 2010, Donald Biorge, as Grantor, transferred two parcels of unencumbered real property ("Iron Rose Lots") previously titled in his name to Noche Holdings, LLC.

- Noche Holdings is owned and controlled by Donald and Monica Biorge.

- On March 19, 2010, the Biorges filed a voluntary petition under chapter 13 of the Bankruptcy Code.

- In their sworn statements and schedules filed in support of their petition:

    1. the Biorges did not disclose Donald's transfer of the Iron Rose Lots to Noche Holdings;

    2. the Biorges did not disclose their ownership and control of the Iron Rose Lots; and

---

[1] All statutory references are to title 11 of the United States Code unless otherwise indicated.
[2] This Memorandum Decision constitutes the Court's findings of fact and conclusions of law under Federal Rule of Civil Procedure 52, made applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedure 7052. Any of the findings of fact herein are also deemed to be conclusions of law, and any conclusions of law herein are also deemed to be findings of fact, and they shall be equally binding as both.

- 3. the Biorges did not disclose Noche Holdings.

- On April 23, 2010, the Biorges attended their § 341 meeting of creditors and gave the following testimony:

Trustee: Mr. and Mrs. Biorge[,] is the information in your bankruptcy papers true, complete, and accurate to the best of your knowledge?

Donald: Yes.

Trustee: Did you review your bankruptcy papers before signing them?

Donald: Yes.

Trustee: Did you personally sign your bankruptcy papers?

Donald: Yes.

Monica: Yes.

Trustee: Have you purchased a vehicle in the last six months?

Donald: No.

Trustee: Have you sold, transferred, or disposed of your interest in any property within one year of your filing?

Donald: No.

Trustee: Ma'am one more time.

Monica: No.

- The Biorges used the Iron Rose Lots from January 26, 2009 through the date of the conversion of their case to chapter 7 to store equipment owned by them, their companies, and third parties, and they paid the property taxes and utility bills associated with the lots from their personal funds.

The Biorges place the blame for their present legal troubles squarely on the shoulders of their former bankruptcy attorney, Jeremy Eveland. Prior to hiring him as bankruptcy counsel, the

Biorges were neighbors and friends with Mr. Eveland and had used him both as a personal attorney and as counsel for their wholly-owned company, Biorge Excavating, LLC. Among other matters, Biorge Excavating hired Mr. Eveland's firm to resolve a dispute with Shorty's Paving, LLC, which initiated a (still ongoing) state-court lawsuit against Biorge Excavating on August 3, 2009.[3] And just before that, in July 2009, the Biorges hired Mr. Eveland to create a family trust, a will, and Noche Holdings,[4] all of which were created upon Mr. Eveland's suggestion that the Biorges needed to protect their assets for themselves and their children. Both Donald and Monica believed that the Iron Rose Lots were transferred into Noche Holdings at the time it was organized,[5] though the transfer did not take place until March 9, 2010.

According to the Biorges, Biorge Excavating was "doing well" when the Biorges organized Noche Holdings and created the family trust and will. However, sometime in "mid-2009," they had discussions with Mr. Eveland regarding their deteriorating financial condition, which eventually led to Mr. Eveland recommending that they file for chapter 13 bankruptcy relief.[6] In the month leading up to their petition date, the Biorges met with Mr. Eveland several times to discuss the bankruptcy. Though Noche Holdings did not appear on their statements and schedules, the Biorges included Biorge Excavating as a "DBA" on their petition and listed assets and liabilities related to Biorge Excavating on their statements and schedules.[7] The Biorges were going through marital difficulties at the time, so they did not always meet with Mr. Eveland together, but Donald and Monica both met with Mr. Eveland and reviewed the statements and schedules that he prepared for their bankruptcy case before the petition was filed. Donald

---

[3] Stipulated Fact #25.
[4] Pltf. Exh. 12 and Def. Exh. A. The family trust was created on or around July 9, 2009, though it is not clear if the trust document was ever executed, and the Articles of Organization for Noche Holdings were filed with the State of Utah on July 13, 2009.
[5] At trial, Monica expressed that she was not sure at the time if the Iron Rose Lots were transferred into the family trust or Noche Holdings, but she knew that they were supposed to be held by one or the other.
[6] Stipulated Fact #37.
[7] Main Case Docket #1 and #5, respectively.

4

testified that he did not review the statements and schedules very closely, because he hired counsel "so [he] could read that kind of stuff for me."[8] Monica testified that she did not review the statements and schedules "as well as [she] should have,"[9] and also that "most of the time . . . Jeremy would not be there when we would sign the papers, he would leave them at the front desk . . . and we would just run in and sign them there."[10]

Just 10 days before the Biorges filed their petition, Donald received a call from Mr. Eveland's office asking him to sign two quitclaim deeds to transfer the Iron Rose Lots to Noche Holdings. According to Donald, it was explained to him that the quitclaim deeds were meant to clean up sloppy paperwork or correct a clerical error. Upon reviewing the quitclaim deeds, Donald noticed that they were back dated to August 3, 2009, the same date that Shorty's Paving filed its lawsuit against Biorge Excavating. Donald asked the notary to correct the date, which she did, and he signed the two quitclaim deeds and left. He did not tell Monica that he had transferred the Iron Rose Lots, nor did Monica learn of the March transfers until much later in the bankruptcy case.

Monica was responsible for paying the property taxes and utility bills on the Iron Rose Lots, and she made payments throughout the chapter 13 case from an account registered to Noche Holdings.[11] Noche Holdings had no income or funds of its own, so the Biorges used their personal funds to pay the property taxes and utility bills.

The Biorges' chapter 13 plan was confirmed on October 10, 2010, and they made payments for several years totaling $60,597.[12] On May 10, 2013, Shorty's Paving filed a motion

---

[8] 7/30/15 Trial Transcript at 11:13:10 a.m. to 11:13:45 a.m.
[9] 7/30/15 Trial Transcript at 9:55:54 a.m. to 9:56:37 a.m.
[10] 7/30/15 Trial Transcript at 9:56:45 a.m. to 9:56:52 a.m.
[11] Pltf. Exh. 19.
[12] Stipulated Fact #39 and Def. Exh. D.

5

to dismiss the case,[13] in which it notified this Court and the Chapter 13 Trustee of the existence of Noche Holdings and the Iron Rose Lots. Mr. Eveland's office prepared a response for the Biorges,[14] but it was never filed as the Biorges hired new counsel on the recommendation of a friend and business associate. On July 23, 2013, the Biorges filed a notice of voluntary conversion to chapter 7,[15] and Stephen Rupp was appointed as the Chapter 7 Trustee. The Trustee listed the Iron Rose Lots for sale and eventually sold them for $200,000.[16] On October 25, 2013, the Trustee filed this adversary proceeding alleging various claims for relief which have now been narrowed down to claims under § 727(a)(2)(A) and (a)(4).

## II. DISCUSSION

### A. § 727(a)(2)(A)

In order to deny a debtor's discharge under § 727(a)(2)(A), a plaintiff "must show by a preponderance of the evidence that (1) the debtor transferred, removed, concealed, destroyed, or mutilated, (2) property of the [debtor], (3) within one year prior to the bankruptcy filing, (4) with the intent to hinder, delay, or defraud a creditor [or the trustee]."[17] By its own terms, § 727(a)(2)(A) focuses on conduct that occurs prior to the bankruptcy filing.

The Trustee's § 727(a)(2)(A) claim against Monica can be resolved fairly easily. The Trustee cannot show that Monica transferred the Iron Rose Lots: they were never in Monica's name, she did not sign the quitclaim deeds, and she was not aware of the transfer when it took place. Nor can the Trustee show that she made some affirmative act to conceal the Iron Rose Lots within one year prior to the bankruptcy petition filing date. Accordingly, the Trustee has

---

[13] Main Case Docket #105.
[14] Def. Exh. E.
[15] Main Case Docket #131.
[16] Main Case Docket #183.
[17] *Mathai v. Warren (In re Warren)*, 512 F.3d 1241, 1249 (10th Cir. 2008) (quoting *Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1293 (10th Cir. 1997)); *See also Wieland v. Gordon (In re Gordon)*, 526 B.R. 376, 388 (10th Cir. BAP 2015).

6

failed to satisfy the first element of a § 727(a)(2)(A) claim against Monica, and the claim will be dismissed.

As for Donald, it is undisputed that he transferred the Iron Rose Lots to Noche Holdings just 10 days prior to the bankruptcy filing, so the Trustee has satisfied the first three elements of his § 727(a)(2)(A) claim. The issue that remains is whether Donald had the requisite intent to hinder, delay, or defraud under § 727(a)(2)(A).

Because debtors rarely lay out their subjective intent, courts often must look for indicia of fraud, such as when a debtor gratuitously transfers property to family members or a closely held entity, makes the transfer after the entry of a large judgment against the debtor, or continues to use transferred property.[18] In this case, Donald admitted that he transferred the Iron Rose Lots to a closely held entity and that he continued to use the property. But more directly, Donald acknowledged that the entire purpose of transferring the Iron Rose Lots to Noche Holdings was to protect his assets from creditors:

> Q: What was the concern about [what] could happen?
>
> A: Talking to Jeremy Eveland, he says, you know, owning a company . . . you need to get your assets protected by putting them in trusts and holding companies and stuff so you can provide for your children and your wife if something happened to you or if someone in your company did something wrong that you weren't party to, it would protect you from losing everything you worked hard for for their bad actions.
>
> Q: Okay, so to protect it for the benefit of you, your wife Monica, and your children?
>
> A: Yes, and . . . yeah.
>
> Q: And that is why Noche Holdings was created?

---

[18] *See Marine Midland Bus. Loans, Inc. v. Carey (In re Carey)*, 938 F.2d 1073, 1077 (10th Cir. 1991).

7

A: Yes, I believe so . . .[19]

Donald's primary defense is that he was just following the advice of legal counsel, and thus he lacked any intent to hinder, delay, or defraud creditors. At its heart, the advice of counsel defense is not so much an affirmative defense as it is a way for a debtor to negate the element of intent.[20] To meet his burden on the advice of counsel defense, Donald must show (1) that all facts were fully and fairly communicated to counsel; (2) that counsel gave legal advice; (3) that Donald relied on the legal advice; and (4) that Donald's reliance was in good faith.[21]

The fact that Mr. Eveland advised Donald to create Noche Holdings and to transfer the Iron Rose Lots is irrelevant, because it does not change Donald's intent at the time. Donald knew exactly what he did and why he did it — he transferred property to protect it from creditors for the benefit of himself, his wife, and his family. Even if he did not intend to defraud creditors, he certainly intended to hinder or delay them from reaching his assets, and that is enough to deny his discharge under § 727(a)(2)(A).

**B. § 727(a)(4)(A)**

To dissuade a debtor from making false statements during his bankruptcy case, § 727(a)(4)(A) provides grounds to deny a debtor's discharge if the debtor "knowingly and fraudulently, in or in connection with the case[,] made a false oath or account." "In order to deny a debtor's discharge pursuant to this provision, [the trustee] must demonstrate by a

---

[19] 7/30/15 Trial Transcript at 10:58:35 a.m. to 10:59:24 a.m. The quoted testimony was not an isolated statement. Donald repeatedly testified at trial that the purpose of Noche Holdings was to protect assets for himself and his family. *See, e.g.*, 7/30/15 Trial Transcript at 10:46:00 a.m. to 10:46:29 a.m. and 11:07:15 a.m. to 11:07:36 a.m.

[20] *Se. Penn. Synod of the Evangelical Lutheran Church in America v. Gotwald (In re Gotwald)*, 488 B.R. 854, 872 (Bankr. E.D. Pa. 2013). Cases frequently require that the debtor's reliance on advice of counsel be "reasonable." But at least in the Tenth Circuit, a debtor must have subjective intent to defraud under § 727(a)(2)(A), or must knowingly and fraudulently lie on his statements and schedules under § 727(a)(4)(A) in order to deny his discharge. *See Warren*, 512 F.3d at 1249. Thus, a debtor must show subjective good faith rather than objective reasonableness in order to negate the element of intent. With that said, the less objectively reasonable a debtor's reliance on counsel is, the less likely it is that he relied on that advice in good faith.

[21] *Gotwald*, 488 B.R. at 873.

preponderance of the evidence that the debtor knowingly and fraudulently made an oath and that the oath relates to a material fact. A false oath may be either: (1) a false statement or omission in the debtor's schedules or (2) a false statement by the debtor at an examination during the course of the proceedings."[22] But "[a] debtor will not be denied [a] discharge if a false statement is due to mere mistake or inadvertence. Moreover, an honest error or mere inaccuracy is not a proper basis for denial of discharge. However, reckless indifference to the truth has consistently been treated as the functional equivalent of fraud for purposes of § 727(a)(4)(A). Reckless disregard means not caring whether some representation is true or false."[23]

As with § 727(a)(2)(A), courts often look for certain indicia of fraud when making a determination under § 727(a)(4)(A). Keeping in mind that the totality of the circumstances must be evaluated, "factors considered under § 727(a)(4)(A) may include the number of omissions; the debtor's profession as it relates to the omissions; how the omission is discovered and how quickly the debtor rectifies the omission; any pattern to the omission; failure to correct all of the inconsistencies and omissions upon making allegedly curative amendments; whether the debtor had access to an attorney; whether the debtor was attempting to place his personal funds beyond the reach of creditors; the seriousness with which the debtor regarded his duties under the Code; and whether the false statements were made in an attempt to advance the debtor's own interests. Even a debtor's purported inexperience with financial affairs does not negate the fact that he made false oaths by knowingly swearing to false information."[24]

The Biorges concede that they failed to disclose the Iron Rose Lots and Noche Holdings on their statements and schedules and in response to direct questions from the Chapter 13

---

[22] *U.S. Trustee v. Garland (In re Garland)*, 417 B.R. 805, 814 (10th Cir. BAP 2009) (quoting *Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1294 (10th Cir. 1997)).
[23] *Freelife Int'l, LLC v. Butler (In re Butler)*, 377 B.R. 895, 922-23 (Bankr. D. Utah 2006) (internal citations, quotations, and punctuation omitted).
[24] *Id.* at 923-24.

Trustee at their § 341 meeting. And the Iron Rose Lots and Noche Holdings were clearly material to their bankruptcy case. So the only issue is whether the Biorges knowingly and fraudulently lied on their statements and schedules or at the § 341 meeting.

The Biorges knew that they were the sole members of Noche Holdings, which held the Iron Rose Lots on their behalf. They also either knew that they had not disclosed Noche Holdings or the Iron Rose Lots on their statements and schedules, or they were recklessly indifferent to that fact due to their failure to closely examine their statements and schedules.[25] And Donald was aware that he had transferred the Iron Rose Lots when he signed the quitclaim deeds just 10 days prepetition, yet he failed to acknowledge the transfer at the § 341 meeting. Monica incorrectly believed that the Iron Rose Lots had been transferred nine months earlier, but she too failed to acknowledge at the § 341 meeting that any transfer had occurred.[26] Accordingly, it is not difficult for the Court to find that the Biorges' lies and omissions were at least "knowing."

Other indicia of fraud are also evident in this case. The Biorges were being pursued by an aggressive creditor since at least August of 2009, roughly the same time that Noche Holdings was created. Donald transferred the Biorges' most valuable unencumbered assets to Noche Holdings just 10 days prepetition to protect them from creditors. The Biorges omitted those assets from their statements and schedules and at their § 341 meeting; they barely reviewed their statements and schedules before they filed their petition; and the assets were only disclosed after the aforementioned aggressive creditor unearthed them three years into the bankruptcy case.

---

[25] At one point in the trial, Monica testified that she knew the Iron Rose Lots were not disclosed on the Biorges' statements and schedules when they were filed. *See* 7/30/15 Trial Transcript at 9:28:34 a.m. to 9:28:37 a.m. She later changed her testimony, saying that she did not notice at the time that Noche Holdings and the Iron Rose Lots were omitted. *See* 7/30/15 Trial Transcript at 9:59:48 a.m. to 9:59:52 a.m.

[26] Monica's mistaken belief that the transfer had occurred nine months prior instead of just 10 days prior is irrelevant, as the Chapter 13 Trustee specifically asked at the § 341 meeting whether the Biorges had transferred any property within one year of the petition date.

Once again, the Biorges assert "advice of counsel" as their primary defense. But the Biorges' defense fails primarily because they cannot recall if Mr. Eveland actually advised them not to disclose Noche Holdings and the Iron Rose Lots on their statements and schedules or at their § 341 meeting. At one point in the trial, Monica gave the following testimony:

> Q: What was your understanding as to why [the Iron Rose Lots and Noche Holdings] weren't on the bankruptcy schedules?
>
> A: Um, they didn't belong on there because it was a separate entity.
>
> Q: And where did that understanding come from?
>
> A: I'm not sure, I believe maybe Jeremy spoke with us about that . . . it was just my understanding as well, I'm not sure where that really came from, I don't recall, but . . . I was under the impression that it was a separate entity.[27]

But when counsel for the Trustee asked Monica whether Mr. Eveland advised her not to disclose the Biorges' ownership of Noche Holdings, she replied with a simple "no."[28] Donald also vacillated when asked whether Mr. Eveland advised him to omit Noche Holdings and the Iron Rose Lots. The gist of his testimony was that he had simply counted on Mr. Eveland to fill out the statements and schedules for him, but he also testified that Mr. Eveland gave him the impression that Noche Holdings was separate from the Biorges' personal bankruptcy.[29] When pressed, Donald said that he could not recall if Mr. Eveland had actually advised him that he could omit Noche Holdings and the Iron Rose Lots from the statements and schedules.[30] As for Mr. Eveland, he testified that Noche Holdings "needed to be disclosed," and would normally be disclosed on Schedule B and the Statement of Financial Affairs, but was probably left out

---

[27] 7/30/15 Trial Transcript at 9:50:27 a.m. to 9:51:05 a.m.
[28] 7/30/15 Trial Transcript at 9:35:19 a.m. to 9:35:26 a.m.
[29] 7/30/15 Trial Transcript at 11:14:41 a.m. to 11:15:07 a.m. In the same breath, Donald testified that he was under the impression that Biorge Excavating was also separate from the Biorges' personal filing.
[30] 7/30/15 Trial Transcript at 11:22:28 a.m. to 11:25:18 a.m.

11

because of "an input error, or simply was forgotten."[31] He also testified that he would not have told the Biorges that they could hide real property. Most importantly, he could not recall ever discussing Noche Holdings or the Iron Rose Properties with the Biorges.[32] Based on the Biorges' conflicting testimonies and Mr. Eveland's testimony, there is no credible evidence that Mr. Eveland advised the Biorges to omit Noche Holdings and the Iron Rose Lots.

At best, the Biorges left Mr. Eveland to fill out their statements and schedules and chose not to ensure the accuracy or truthfulness of the documents. To make matters worse, Donald testified that he "didn't put much thought into" what needed to be disclosed at the § 341 meeting, and Monica testified that she "didn't sit there and do the math" to figure out when she thought the transfer had occurred.[33] Instead of being forthright, they chose to resolve their uncertainties by not disclosing their assets. The Court is troubled by such a cavalier attitude towards the truth.

The Court also doubts the truthfulness of the Biorges' testimonies that they believed Noche Holdings, as an entity, was somehow separate from their personal bankruptcy. The Biorges filed their petition with Biorge Excavating as a D/B/A and included many of its assets and liabilities in their statements and schedules. Thus, they had reason to believe that Noche Holdings also needed to be included in their statements and schedules, particularly since it was holding property for their personal benefit.

In sum, the Trustee has shown, at the very least, that the Biorges acted with a reckless disregard for the truth, which is enough to satisfy the "knowingly and fraudulently" prong of § 727(a)(4)(A). Accordingly, both Donald's and Monica's discharge will be denied under § 727(a)(4)(A).

---

[31] 7/30/15 Trial Transcript at 1:19:06 p.m. to 1:19:15 p.m.
[32] At trial, Mr. Eveland admitted that he recently pleaded guilty to a third-degree felony for communications fraud and has since been disbarred from federal court. The Court took Mr. Eveland's criminal conviction into account when assessing his credibility as a witness.
[33] 7/30/15 Trial Transcript at 11:19:38 a.m. to 11:19:50 a.m. and 10:33:55 a.m. to 10:34:16 a.m., respectively.

## III. CONCLUSION

Bankruptcy is meant to provide a fresh start for honest but unfortunate debtors. But it is a process predicated on transparency, which requires debtors to be honest and forthright to creditors, the trustee, and the court. These Debtors were not. For Donald, the Court finds that he transferred the Iron Rose Lots to Noche Holdings with the intent to hinder or delay creditors, thus requiring that his discharge be denied under § 727(a)(2)(A). And for both of the Biorges, the Court finds that they knowingly and fraudulently failed to disclose Noche Holdings and the Iron Rose Lots on their statements and schedules and at their § 341 meeting, thus requiring that their discharge be denied under § 727(a)(4)(A).

The Trustee is ordered to submit a separate judgment in accordance with this Memorandum Decision.

-------------------------------------------END OF DOCUMENT-------------------------------------------

Case 13-02430    Doc 65    Filed 08/24/15    Entered 08/24/15 15:33:06    Desc Main
            Document      Page 14 of 14

_____ooo0ooo_____<br>
**SERVICE LIST**

Service of the foregoing **MEMORANDUM DECISION** will be effected through the Bankruptcy Noticing Center to each party listed below.

Jeremy Sink
Mckay Burton & Thurman
15 W. South Temple, Suite 1000
Salt Lake City, UT 84101
    *Counsel for Plaintiff*

Marcus Mumford
Joshua Ostler
Mumford, P.C.
405 S. Main St., Suite 975
Salt Lake City, UT 84111
    *Counsel for Defendant*